# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| In re,<br><br>Dozier Financial, Inc.,<br><br>Debtor(s).<br><br>Janet B. Haigler,<br><br>Plaintiff(s),<br><br>v.<br><br>Michael Dozier, Sequence Financial Specialists, LLC, WebsterRogers, LLP, WebsterRogers Financial Advisors, LLC, Shilson, Goldberg, Cheung & Associates, Willcox Buyck and Williams, P.A.,<br><br>Defendant(s). | C/A No. 14-04262-HB<br><br>Adv. Pro. No. 17-80113-HB<br><br>Chapter 7<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT SHILSON, GOLDBERG, CHEUNG & ASSOCIATES' MOTION TO DISMISS OR ALTERNATIVELY, MOTION TO TRANSFER VENUE** |

**THIS MATTER** came before the Court for hearing on May 17, 2018, for consideration of the Motion to Dismiss or, alternatively, Transfer Venue filed by Defendant Shilson, Goldberg, Cheung & Associates ("SGC").[1] Plaintiff Janet B. Haigler, Chapter 7 Trustee in the above captioned case ("Trustee"), objected.[2] Present at the hearing were Frank L. McElroy and David Overstreet, counsel for SGC, as well as Richard R. Gleissner, counsel for the Trustee. The Motion asserts the Trustee's Complaint against SGC should be dismissed pursuant to Fed. R. Civ. P. 12(b)(3)[3] for improper venue, or alternatively venue should be transferred to another district. SGC also moves for dismissal pursuant to Fed. R. Civ. P. 12(b)(6).

---

[1] ECF No. 29, filed Feb. 28, 2018.
[2] ECF No. 44, filed Mar. 26, 2018.
[3] Made applicable to this adversary proceeding by Fed. R. Bankr. P. 7012(b).

I.  JURISDICTION

This proceeding relates to the Chapter 7 bankruptcy case of Dozier Financial, Inc. ("Debtor") pending in this Court.  The United States District Court for the District of South Carolina has jurisdiction under 28 U.S.C. § 1334(b).  Pursuant to 28 U.S.C. § 157(a) and Local Civ. Rule 83.IX.01 (D.S.C.), the district court has referred this proceeding to the bankruptcy court. This proceeding involves claims for damages under non-bankruptcy law and is not a "core proceeding" within the meaning of 28 U.S.C. § 157(b)(2).[4]  Under 28 U.S.C. § 157(c), this Court has the authority to hear, but not to determine, a non-core proceeding unless all of the parties consent to this Court's determination under 28 U.S.C. § 157(c)(2).

II.  TRUSTEE'S ALLEGATIONS[5]

Trustee brings this action on behalf of the estate ("Estate Claims") and as a result of claims assigned to the estate that were personal to certain investors/creditors of Debtor ("Investor Claims").  All of the claims arise from actions relating to Defendants' involvement with the restructuring of Michael Dozier's business operations and selling of securities to third party investors to raise funds.  Trustee seeks to recover the losses that resulted from the sale of such securities and alleges that all Defendants played a role in causing the losses.

Michael Dozier was the sole shareholder, director, and officer of Debtor and operated used car dealerships in South Carolina.  In April 2009, Michael Dozier employed WebsterRogers, LLP and WebsterRogers Financial Advisors, LLC (collectively, "WebsterRogers") and Sequence Financial Specialists, LLC ("Sequence") to facilitate in the restructuring of his business and to

---

[4] The Complaint fails to assert whether this matter is a core proceeding.  However, Trustee's Objection acknowledges this matter is not a core proceeding under 28 U.S.C. § 157(b)(2).
[5] These allegations are also set forth in the *Order Granting in Part and Denying in Part the Motions to Dismiss filed by Defendants Sequence Financial Specialists, LLC, WebsterRogers, LLP, WebsterRogers Financial Advisors, LLC, and Willcox Buyck and Williams, P.A.* (ECF No. 48, entered Apr. 20, 2018).  This Order includes additional allegations concerning SGC's involvement in this matter.  For purposes of this Motion, the allegations are construed in favor of the plaintiff.

raise capital to support the dealerships' operations.  Throughout their involvement, Sequence and WebsterRogers marketed themselves and operated as a single firm providing accounting and investment advice services to Debtor.

WebsterRogers and Sequence provided Michael Dozier with advice to create a business model that involved the formation of several business entities, including Debtor.  Debtor's business primarily involved servicing financing contracts for Michael Dozier's used car dealerships. WebsterRogers and Sequence also recommended Michael Dozier begin selling securities to investors to raise funds.  Sequence agreed to act as the placement agent for any private offering of any securities, as an underwriter in any public offering of securities, and as a broker in soliciting investments in Debtor.

In July 2009, Michael Dozier engaged Willcox Buyck and Williams, P.A. ("WBW"), a law firm located in South Carolina, to provide legal services, including advice related to the restructuring of his business and the securities transactions.  WBW assisted with the formation of the various entities that formed Michael Dozier's business model, including Debtor and the car dealerships.  WBW also assisted with enabling Debtor to secure capital through security offerings, including the drafting of offerings for the solicitation of investments from third parties.  Sequence and WebsterRogers were also engaged to seek additional financing necessary for implementing the business model it had previously developed and to consult with WBW regarding the issuance of a private placement memorandum to raise capital.  WebsterRogers also specifically agreed to determine and evaluate the tax and generally accepted accounting principles and reporting options for the businesses.

Despite hiring professionals, Michael Dozier used the business' accounts to improperly pay for personal obligations and excessive compensation from the inception of Debtor and the

other related entities.   The Defendants were aware that Michael Dozier was improperly appropriating assets of the businesses for his personal benefit.[6]

Sequence, WebsterRogers, and WBW generated the financial reports for the Debtor, which included the company ledgers for the car dealerships and Debtor, profit and loss statements, balance sheets, income statements, and cash flow statements.   These Defendants knew these financial reports would be used by Debtor in acquiring capital through the sale of securities.   These financial reports were deficient, false, and misleading because they, through improper accounting methods: improperly allocated assets, liabilities, and costs; significantly overestimated the accounts receivable owed to the Debtor from the related entities; and significantly underestimated the amounts payable by the Debtor.   As a result, the financial statements made it appear that Debtor had a positive net worth when the business was actually operating at or near a net loss.

When confronted with numerous red flags concerning the accuracy of Debtor's financial statements, Sequence and WebsterRogers did not abide by the standards of due diligence governing the conduct of brokers, underwriters, and investment advisers.   Sequence and its employees also assisted Michael Dozier in his concealment of Debtor's financial condition from Debtor and the investors.

The financial statements were used to market the securities to be purchased by the investors.   The investors were first solicited to invest in Debtor in September 2009 through a Private Placement Memorandum ("2009 PPM"), which was drafted by WBW.   Prior to approval of these materials and their distribution to investors, Sequence and WebsterRogers did not conduct independent investigations into the capital requirements of Michael Dozier's business.   Overall, in

---

[6] Although the Complaint alleges "Defendants" were aware of Michael Dozier's conduct, SGC had not yet been retained by Debtor.

offering and selling these investments, Defendants[7] made false and misleading disclosures and omitted material facts relating to the risks of investing in the Debtor, the Debtor's financial performance, and how the Debtor would use the investment proceeds. The 2009 PPM also made a selling point to investors that independent underwriters, brokers, accountants, and attorneys had performed due diligence and, thus, acted as gatekeepers against possible misdeeds by Debtor or Michael Dozier. However, the investors' funds were improperly used for liabilities and operating costs of the car dealerships, personal obligations of Michael Dozier, and improper distributions to him. Defendants knew the 2009 PPM included these misrepresentations and omissions regarding Debtor's business and the investment risks associated therewith.

In October 2009, Michael Dozier began selling securities to the public that he believed were exempt offerings under federal and state securities laws. Sequence and WebsterRogers did not conduct independent investigations to ensure that Michael Dozier did not sell stock to unaccredited investors, which would destroy any safe harbor registration exemption for the securities issued under the 2009 PPM.

In December 2009, WBW was made aware that proceeds of the 2009 offering were not being used in accordance with the escrow terms provided in the 2009 PPM and that the offering was improperly handled by Michael Dozier, which could raise securities liability. WBW had a duty to advise the Debtor and investors to address this transactional risk.

In March 2010, Sequence, WebsterRogers, and WBW compiled an addendum to the 2009 PPM to be sent to prior and new, prospective investors ("2010 Executive Summary"). The 2010 Executive Summary attached unaudited financial reports for the Debtor that were prepared by Sequence and WebsterRogers. These financial reports included the same material

---

[7] Although the Complaint alleges "Defendants" knew of the misrepresentations and omissions in the 2009 PPM, SGC had not yet been retained by Debtor.

misrepresentations in the prior financial reports and 2009 PPM. Despite this, WBW, Sequence, and WebsterRogers approved the 2010 Executive Summary and enclosed information to be used by Michael Dozier in future solicitations from investors.

Upon the recommendation of WebsterRogers and Sequence, SGC was retained by the Debtor in late 2010 or early 2011. SGC is an accounting firm located in Houston, Texas, with extensive experience with used car dealerships and their related finance companies. Debtor and SGC entered into an Engagement Agreement dated January 3, 2011, which includes the following forum selection clause ("FSC"):

> This engagement letter shall be governed by the laws of the State of Texas. Any suit, action or proceeding arising out of or relating to this engagement letter shall only be brought in the State of Texas and you agree to the personal jurisdiction of the courts of the State of Texas. This contract is performable in Harris County, Texas.

SGC was engaged to conduct an audit of Debtor's 2010 financial statements. SGC also performed administrative and consolidation work in connection with Debtor's annual financials and performed other services for the Debtor.

SGC failed to comply with auditing standards by failing to obtain reasonable assurance that the financial statements it was auditing were free of material misstatements and failing to assess the risk that Debtor's financial statements could be materially misstated as a result of fraud. SGC, in violation of professional standards, either knowingly misrepresented the financial records of the Debtor or merely accepted management's representations without attempting to corroborate or collect support for those representations. SGC also failed to obtain sufficient competent evidence regarding the amounts recorded in Debtor's financial statements and failed to adequately evaluate the competence and sufficiency of information. There were significant accounting red flags within the SGC-prepared audit report of Debtor that SGC, Sequence, and WebsterRogers should have been aware of and resulted in a severely deficient audit report, which was subsequently

used in the issuance of private placement memoranda and other marketing materials to raise capital for the Debtor.

In 2011, Michael Dozier began a check kiting scheme between the accounts of the Debtor and the car dealerships.  These fraudulent transfers gave rise to obligations of Michael Dozier, the Debtor, and the dealerships in excess of $3,000,000.00 to the banks with negative cash balances. Michael Dozier disclosed to WBW, Sequence, and WebsterRogers that liabilities were generated at banks where he and the Debtor held accounts as a result of a series of overdrafts.  WBW also learned that several of the overdrafts were directly tied to proceeds from the prior offerings.  To correct this significant shortfall, Michael Dozier, Sequence, WebsterRogers, and WBW prepared another private offering memorandum and updated the marketing materials for the offering ("2011 PPM").

The 2011 PPM did not explain the intended use of the proceeds to pay off these liabilities, even though these proceeds were immediately used for liabilities of Debtor and Michael Dozier and were wrongfully diverted for personal payments to Michael Dozier.  Additionally, the 2011 PPM incorporated misstatements from the previous offerings and provided financial reports for Debtor, including those subject to SGC's audit, that included incorrect information.  Like the 2009 PPM, the 2011 PPM made a selling point to investors that independent underwriters, brokers, and attorneys had performed due diligence and, thus, acted as gatekeepers against possible misdeeds by the Debtor and Michael Dozier – even though the Defendants were already aware of Michael Dozier's improper conduct.

When the investors' first notes became due in Fall 2012, additional information was sent to them regarding the ability to extend the terms of their notes as well as soliciting new investments ("Rollover Letters").  The Rollover Letters informed investors that they could renew their notes or

liquidate them and receive their interest and principal in full, even though Debtor lacked the ability to repay the notes. The Rollover Letters stated Debtor was continuing its growth and success, when in actuality it was insolvent.

In late 2013, Debtor began missing scheduled note payments and Michael Dozier informed the investors that the delay would be temporary. WBW should have advised the investors that the missed note payments signaled a material risk that the business was failing and, therefore, in order to protect themselves from harm, the investors should verify any representations.

From October 2009 through June 2013, Debtor raised approximately $3,621,116.14 from at least 36 investors in at least two states (North and South Carolina). These funds were raised through the sale of at least 73 nonnegotiable promissory notes to both accredited and unaccredited investors; however, many of the investors were unaccredited, unsophisticated, and elderly. Much of the money raised through the improper securities offerings was appropriated by Michael Dozier to pay the fees for the services rendered by Sequence, WebsterRogers, WBW, and SGC, or for Michael Dozier's own personal obligations.

In Spring 2014, WBW began collecting the necessary information for filing a Form D with the Securities and Exchange Commission or the Attorney General, but ultimately failed to comply with this requirement. An involuntary Chapter 7 petition was filed against Debtor in this Court on July 29, 2014, and the order for relief was entered on August 28, 2014.

### III.    CAUSES OF ACTION

Trustee asserts generally that SGC, in connection with the offer and sale of securities, disseminated or approved false statements that it knew or reasonably should have known were false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements not misleading and the investors relied on such

misrepresentations and omissions.  As a result, SGC also breached its contractual and common law duties owed to the Debtor and the investors.  Trustee asserts similar claims against the other Defendants.

The causes of action in the Complaint are divided into two categories: personal claims to the Debtor stemming from Trustee's role as bankruptcy trustee for the Debtor (the Estate Claims); and claims assigned to the estate that were personal to investors of the Debtor (the Investor Claims).  Some of the causes of action appear to seek relief on behalf of both the estate and the investors.  The Estate Claims against SGC are as follows: (1) breach of contract accompanied by fraudulent act; (2) common law fraud; (3) negligence; (4) breach of fiduciary duty; (5) aiding and abetting breach of fiduciary duty; and (6) constructive fraud.

With regard to the Investor Claims, the Complaint alleges that between January 2, 2017, and October 6, 2017, numerous individuals who invested in Debtor assigned to Trustee all of their right, title, and interest in and to the claims set forth in the Complaint and the Trustee is now the true and lawful owner of the claims.  The Investor Claims against SGC are: (1) violation of § 10 and Rule 10b-5 of the Securities and Exchange Act of 1934, which makes it unlawful to employ deceptive or manipulative devices "in connection with the purchase or sale of any security[,]" 15 U.S.C. § 78j; (2) common law fraud; (3) negligence; (4) breach of fiduciary duty; and (5) constructive fraud.

### DISCUSSION AND CONCLUSIONS OF LAW

By filing the instant Motion seeking relief from this Court and not expressly objecting to this Court making a final determination on this Motion, the parties have consented to the Court's determination of this Motion under 28 U.S.C. § 157(c)(2).[8]

---

[8] *See In re AstroTurf, LLC*, C/A No. 16-41504-PWB, 2017 WL 3889710, at *2 (Bankr. N.D. Ga. Sept. 5, 2017) (concluding that the defendant consented to the court's determination of its motion to dismiss because the defendant

## I.   IMPROPER VENUE UNDER RULE 12(B)(3)

SGC moves to dismiss this adversary proceeding, arguing the FSC renders this venue improper under Rule 12(b)(3).  Rule 12(b)(3) permits a party to file a motion to dismiss for improper venue. Fed. R. Civ. P. 12(b)(3); *Pee Dee Health Care, P.A. v. Sanford*, 509 F.3d 204, 209 (4th Cir. 2007).  When a defendant objects to venue under Rule 12(b)(3), the plaintiff bears the burden of establishing that venue is proper. *Motley Rice, LLC v. Baldwin & Baldwin, LLP*, 518 F. Supp. 2d 688 (D.S.C. 2007).  The plaintiff is required to make only a *prima facie* showing of proper venue in order to survive a motion to dismiss. *Aggarao v. MOL Ship Mgmt. Co.*, 675 F.3d 355, 366 (4th Cir. 2012).  In assessing whether plaintiff has made that showing, courts must construe all factual allegations in favor of the plaintiff. *Id.*

In *Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas*, 571 U.S. 49, 134 S. Ct. 568, 187 L. Ed. 2d 487 (2013), the Supreme Court held that whether the venue is "improper" for Rule 12(b)(3) purposes "depends exclusively on whether the court in which the case was brought satisfies the requirements of federal venue laws . . ." and is governed by the applicable venue statute. *Id.* at 577.  "Whether the parties entered into a contract containing a forum-selection clause has no bearing on whether a case falls into one of the categories of cases listed in [the applicable venue statute].  As a result, a case filed in a district that falls within [the applicable venue statute] may not be dismissed under . . . Rule 12(b)(3)." *Id.*

Venue in the bankruptcy court is governed by 28 U.S.C. §§ 1408 and 1409.  As applicable here, § 1409 states that "a proceeding arising under title 11 or arising in or related to a case under

---

"invokes the Court's determination of it without objecting to its authority to do so.  The Court does not consider [the defendant's] invocation of a ruling on its motion to constitute an admission that this is a core proceeding or consent to determination of other issues that may arise in this proceeding."); *In re Westbrook*, 123 B.R. 728, 730 (Bankr. E.D. Pa. 1991) (finding that the defendant "praying that this court shall grant its Motion to Dismiss, appears to either concur that this matter is core or likewise consent to our determining the Motion").

title 11 may be commenced in the district court in which such case is pending." 28 U.S.C. § 1409(a). Debtor's Chapter 7 bankruptcy case is pending in this district. Therefore, under § 1409(a), the District of South Carolina is a proper venue for this adversary proceeding that relates to Debtor's bankruptcy case. The Estate and Investor Claims may not be dismissed solely because the Debtor and SGC entered into a pre-petition contract with an FSC providing any case arising therefrom must be brought in a different court. *See Atl. Marine*, 134 S. Ct. at 577. Consequently, dismissal pursuant to Rule 12(b)(3) is not warranted.

## II.    TRANSFER OF VENUE

SGC moves for alternative relief to transfer some or all of the causes of action against it to the United States District Court for the Southern District of Texas pursuant to 28 U.S.C. § 1404(a), which provides "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." 28 U.S.C. § 1404(a).[9]

"When the parties have agreed to a valid forum-selection clause, a district court should ordinarily transfer the case to the forum specified in that clause." *Atl. Marine Const. Co.*, 134 S. Ct. at 581. The "enforcement of valid forum-selection clauses, bargained for by the parties, protects their legitimate expectations and furthers vital interests of the justice system." *Id.* (quoting *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 33 (1988) (Kennedy, J., concurring)). Further, a valid FSC pointing to another forum should be "given controlling weight in all but the most exceptional cases." *Id.* at 579.

---

[9] "Transfer of venue for non-core proceedings is governed by 28 U.S.C. § 1404(a). Transfer of venue for core proceedings as well as bankruptcy petitions themselves, on the other hand, is governed by 28 U.S.C. § 1412." *ICICI Bank Ltd. v. Essar Glob. Fund Ltd.*, 565 B.R. 241, 248 (S.D.N.Y. 2017) (citations omitted).

The presence of a valid FSC requires a court to adjust its usual analysis under § 1404(a). *Id.* at 581. The plaintiff's initial choice of forum is given no weight, and the burden shifts to the party opposing enforcement of the FSC to establish that transfer to the selected forum is unwarranted. *Id.* at 581. The original venue's choice-of-law rules will not be applied by the transferee venue. *Id.* at 582. The court should not consider the private interests of the contracting parties, but should assume the private interest factors weigh entirely in favor of the forum specified in the FSC because "[w]hatever 'inconvenience' [the parties] would suffer by being forced to litigate in the contractual forum as [they] agreed to do was clearly foreseeable at the time of contracting." *Id.* (citations omitted). As a result, the court should consider only the public interest factors, as opposed to weighing both the public and private interest factors. *Id.*

> Public-interest factors *may* include: (1) comparative administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) avoidance of unnecessary problems of conflict of laws or in the application of foreign law.

*Id.* at 582, n.6 (emphasis added) (citing *Norwood v. Kirkpatrick*, 349 U.S. 29, 32 75 S. Ct. 544, 99 L. Ed. 789 (1955)). These factors are not exhaustive and courts have found the following to also be instructive for determining whether to transfer venue under § 1404: (1) the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; (2) the unfairness of burdening citizens in an unrelated forum with jury duty, *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 260 n.6, 102 S. Ct. 252, 70 L. Ed. 2d 419 (1981); (3) the enforceability of the judgment; (4) practical considerations that could make the trial easy, expeditious, or inexpensive; (5) the relative administrative difficulty in the two forums resulting from court congestion; (6) the local interest in deciding local controversies at home; (7) the public policies of the forums; (8) and the familiarity of the trial judge with the applicable state law in diversity cases. *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 879-80 (3d Cir. 1995). Because the public interest

"will rarely defeat a transfer motion, the practical result is that forum-selection clauses should control except in unusual cases." *Atl. Marine*, 134 S. Ct. at 582.

Other public interest factors have been considered in the bankruptcy context, including the creditors' interests since the estate is often operating on limited funds and asserting actions solely to maximize the recovery to creditors. *See Bavaria Yachts USA, LLLP v. Bavaria Yachtau GmbH (In re Bavaria Yachts USA, LLLP)*, 575 B.R. 540, 560-63 (Bankr. N.D. Ga. 2017); *In re Veros Energy, LLC*, C/A No. 16-70021-JHH, 2018 WL 1989475, at *16 (Bankr. N.D. Ala. Apr. 26, 2018); *In re I.E. Liquidation, Inc.*, C/A No. 06-62179, 2015 WL 5307446, at *6 (Bankr. N.D. Ohio Sept. 10, 2015) ("Because bankruptcy courts, when analyzing matters similar to those in *Atlantic Marine*, evaluate litigation costs as public interest factors, it provides additional support for retaining litigation expenses as a relevant factor in bankruptcy, even in light of a forum selection clause."). Although "there is the public policy of enforcing a contract . . . there [also] is the public policy of centralizing bankruptcy proceedings, and there is a strong presumption in favor of maintaining the venue of an adversary proceeding where the bankruptcy is pending." *Id.* at 558 (citing *In re Hechinger Inv. Co. of Delaware, Inc.*, 288 B.R. 398, 402 (Bankr. D. Del. 2003)). "Because the bankruptcy system implicates interests far broader than the private rights of the two parties in question, it is not unusual for prepetition contract obligations, particularly those dictating forum . . . to be modified or even ignored in a bankruptcy case." *Id.* at 559 (citing *Walker v. Got'cha Towing & Recovery (In re Walker)*, 551 B.R. 679, 690 n.21 (Bankr. M.D. Ga. 2016)).

Assuming a valid FSC is applicable to the claims asserted against SGC, the Court is not convinced that public interest factors such as familiarity, conflict or application of laws are relevant here. Nor is it clear that there are significant differences in comparative congestion between the South Carolina and Texas courts. However, examining "the local interest in having localized

interests decided at home" factor is somewhat helpful.  Although SGC argues the audit work was performed in Texas, the investments and losses in question involved a South Carolina business, investors located in South Carolina, and resulted in a South Carolina bankruptcy proceeding. These facts weigh in favor of a South Carolina forum.

While the Supreme Court gave a clear directive in *Atlantic Marine* to give effect to a valid FSC in all but the most unusual of circumstances, the Court must be mindful of the differences here and seek guidance from other authorities cited above.  *Atlantic Marine* did not involve claims arising in or related to the liquidation of an insolvent's assets in a bankruptcy case pending in a venue differing from the one provided in the FSC.[10]  Further, as the recitation of the allegations above indicates, Trustee asserts each named Defendant had a role in the damages and claims asserted.  Pursuing some or all of the claims set forth in this proceeding in a Texas court while maintaining the remaining pieces of the puzzle here would result in substantially duplicative discovery and court proceedings, resulting only in a waste of time and resources for not only the Debtor and SGC, but also for parties and witnesses that did not agree to litigation in Texas and, ultimately, the creditors of the estate. *See In re LMI Legacy Holdings, Inc.*, 553 B.R. 235, 241-42 (Bankr. D. Del. 2016) (denying enforcement of a forum-selection clause where the interest of the other defendants and judicial economy outweighed enforcement of the agreement).  The purpose or result of enforcing a FSC should not be to multiply litigation and increase the costs for parties

---

[10] Typically, a transfer of venue of a case or proceeding under Title 11 is governed by 28 U.S.C. § 1412.  In deciding whether the transfer of such matters are in the interest of justice, the courts consider factors including:

(1) ***the economical and efficient administration of the bankruptcy estate***, (2) the presumption in favor of the forum where the bankruptcy case is pending, (3) judicial efficiency; (4) the ability to receive a fair trial, (5) the state's interest in having local controversies decided within its borders by those familiar with its laws, (6) the enforceability of any judgment rendered, and (7) the plaintiff's original choice of forum.

*Creekridge Capital, LLC v. Louisiana Hosp. Ctr., LLC*, 410 B.R. 623, 629 (D. Minn. 2009) (emphasis added). Granting SGC's request and having duplicate actions pending in South Carolina and Texas would not promote the economic and efficient administration of Debtor's bankruptcy estate.

that did not agree to be bound by it.  Practical considerations exist here that could make the trial easy, expeditious, or inexpensive, thus tipping the scales in favor of the South Carolina forum.

While *Atlantic Marine* involved the transfer of an entire case in which all claims were brought by a single plaintiff against a single defendant and all claims and parties were covered by a valid FSC, this case is different.  Although there is no dispute as to whether this FSC itself is valid, it is contained in an Engagement Agreement executed only by the Debtor and SGC.  This case involves claims based on a core set of facts against SGC and five other Defendants that are not parties to the Engagement Agreement.  This case also involves some Investor Claims that are likely not governed by the FSC.  The Supreme Court pointed out that "courts should not unnecessarily disrupt the parties' settled expectations." *Id.* at 583.  However, those expectations have been disrupted here by the intervention of this bankruptcy case and the filing of this adversary proceeding involving parties not subject to and claims not covered by this FSC.

An FSC is intended to give parties greater predictability about where they would engage in future litigation and "may have been a critical factor in their agreement to do business together in the first place." *Id.* at 583.  However, that purpose is not served and is actually counterproductive in a situation such as this where the Trustee is pursuing other substantial, overlapping claims to which the FSC does not apply, and where duplicative discovery will clearly result for those that did not agree to the FSC.  Reflecting on the practical considerations that could make the trial easy, expeditious, or inexpensive, the local interest in deciding local controversies at home, the pending gathering and distribution of assets in this forum, the interests of the other Defendants, and judicial economy, the Court finds the public interests are best served by retention of the Estate and Investor Claims against SGC together in this forum, and those interests present unusual circumstances that

outweigh the deference due to the FSC.  Therefore, SGC's Motion to Transfer Venue is denied as

to all Estate and Investor Claims asserted against SGC.

## III.    RULE 12(B)(6) DISMISSAL

Having determined that venue in this Court is proper, the Court turns to the remaining

grounds for dismissal asserted in SGC's Motion.[11]

### A.    STANDARD OF REVIEW

Rule 8 provides that a complaint must contain "a short and plain statement of the claim

showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  A motion filed under 12(b)(6)

challenges the legal sufficiency of the Complaint and provides that a party may move to dismiss

for failure to state a claim upon which relief can be granted.  When ruling on a motion to dismiss

under Rule 12(b)(6), "the court should accept as true all well-pleaded allegations and should view

the complaint in a light most favorable to the plaintiff." *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130,

1134 (4th Cir. 1993).  In order to survive a motion to dismiss, "a complaint must contain sufficient

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v.*

*Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007)).

"In addition to meeting the plausibility standard of *Iqbal*, fraud claims . . . must be pleaded

with particularity pursuant to Rule 9(b) of the Federal Rules of Civil Procedure." *U.S. ex rel.*

*Nathan v. Takeda Pharm. N. Am., Inc.*, 707 F.3d 451, 455-56 (4th Cir. 2013) *cert. denied*, 134 S.

Ct. 1759, 188 L. Ed. 2d 592 (2014) (citing *Harrison v. Westinghouse Savannah River Co.*, 176

F.3d 776, 783-85 (4th Cir. 1999)).  Pursuant to Rule 9(b), "[i]n alleging fraud or mistake, a party

---

[11] SGC joined in the arguments provided in the other Defendants' Motions to Dismiss.  This Order includes the same standard of review and relevant findings provided in the *Order Granting in Part and Denying in Part the Motions to Dismiss filed by Defendants Sequence Financial Specialists, LLC, WebsterRogers, LLP, WebsterRogers Financial Advisors, LLC, and Willcox Buyck and Williams, P.A.* for those grounds in which SGC's Motion is granted. (ECF No. 48, entered Apr. 20, 2018).  Other arguments joined in by SGC and denied in the Court's prior order need not be repeated here.  However, this Order addresses additional grounds for dismissal asserted by SGC.

must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). "To meet this standard, [a] plaintiff must, at minimum, describe 'the time, place, and contents of the false representations as well as the identity of the person making the misrepresentation and what he obtained thereby.'" *U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 379 (4th Cir. 2008) (quoting *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999)).

B. Trustee's Claims are not Time-Barred

SGC asserts the Investor Claims are barred by the applicable statute of repose and statute of limitations. SGC argues these claims arise from its audit of Debtor's financials in 2011 and, therefore, were time-barred by the time Trustee brought this action in 2017.

"Ordinarily, a defense based on the statute of limitations must be raised by the defendant through an affirmative defense, *see* Fed. R. Civ. P. 8(c), and the burden of establishing the affirmative defense rests on the defendant." *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007). However, "where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." *Id.* "This principal only applies, however, if all facts necessary to the affirmative defense 'clearly appear *on the face of the complaint.*'" *Id.* (quoting *Richmond, Fredericksburg & Potomac R.R. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993) (emphasis in original)).

The parties agree that the claim for violations of § 10 of the Securities and Exchange Act and Rule 10b-5 is governed by the statute of limitations as set forth in 28 U.S.C. § 1658, which provides in relevant part:

> a private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities

17

laws, as defined in section 3(a)(47) of the Securities Exchange Act of 1934 (15
U.S.C. 78c(a)(47)), may be brought not later than the earlier of—

    (1) 2 years after the discovery of the facts constituting the violation; or

    (2) 5 years after such violation.

28 U.S.C. § 1658(b).  Therefore, this claim is subject to a two-year statute of limitations and five-

year statute of repose.

       The Securities and Exchange Act imposes liability for material misrepresentations with

respect to the "purchase or sale" of a security. 15 U.S.C. § 78j(b).  Thus, "[t]he statute of repose for

a Section 10(b) claim 'starts to run on the date the parties have committed themselves to complete

the purchase or sale transaction.'" *Carlucci v. Han*, 886 F. Supp. 2d 497, 514 (E.D. Va. 2012)

(quoting *Arnold v. KPMG LLP,* 334 Fed. App'x 349, 351 (2d Cir. 2009)).  "In the Fourth Circuit,

the statute of limitations begins to run when the fraud is discovered or should have been

discovered by the exercise of due diligence." *Latham v. Matthews*, 662 F. Supp. 2d 441, 450

(D.S.C. 2009) (citing *Brumbaugh v. Princeton Partners*, 985 F.2d 157, 162 (4th Cir. 1993)).  The

Complaint fails to include on its face all the facts necessary to determine that the purchase of the

securities at issue occurred more than 5 years prior to the Trustee bringing this action or that more

than 2 years passed after the fraud was discovered or should have been discovered.  Therefore, the

Court cannot determine that the applicable statute of repose or statute of limitations bars this claim

against SGC and its request must be denied.

       With regard to the other Investor Claims asserted against SGC – common law fraud,

negligence, breach of fiduciary duty, and constructive fraud – the potential statute of limitations

period ranges from two to four years[12] and each is governed by the "discovery rule."[13]  Under the

discovery rule, "the statute of limitations begins to run when a person could or should have known,

through the exercise of reasonable diligence that a cause of action might exist." *Moore v. Benson*,

390 S.C. 153, 161, 700 S.E.2d 273, 277 (Ct. App. 2010) (citing *Abba Equip., Inc. v. Thomason,* 335

S.C. 477, 485, 517 S.E.2d 235, 239 (Ct. App. 1999)); *see also Gibson v. Ellis*, 58 S.W.3d 818, 823

(Tex. App. 2001) ("The discovery rule exception defers accrual of a cause of action until the

plaintiff knew or, exercising reasonable diligence, should have known of the facts giving rise to

the cause of action." (quoting *Computer Assocs., Int'l v. Altai, Inc.,* 918 S.W.2d 453, 455 (Tex.

1996)).

Because these claims were purportedly assigned to the Trustee by certain investors, the

relevant time period begins to run when those investors reasonably should have known about the

alleged conduct giving rise to these claims.  There are no allegations in the Complaint to clearly

discern what point in time the investors knew, or by the exercise of reasonable diligence should

have known, about SGC's alleged fraudulent or negligent conduct.  Accordingly, looking to the

---

[12] *See* Tex. Civ. Prac. & Rem. Code § 16.003 & 16.004(a)(4); S.C. Code Ann. § 15-3-530.  While SGC asserts Texas law applies under the choice of law provision in the Engagement Letter, the Trustee does not argue whether Texas or South Carolina law applies to these claims and the Court does not need to determine the applicable law for purposes of this Motion.

[13] *See* S.C. Code Ann. § 15-3-535; *Kreutner v. David*, 320 S.C. 283, 285, 465 S.E.2d 88, 90 (1995) (applying discovery rule to negligence claim); *Burgess v. Am. Cancer Soc., S.C. Div., Inc.*, 300 S.C. 182, 185, 386 S.E.2d 798, 799 (Ct. App. 1989) ("In South Carolina, the statute of limitations for causes of action for fraud is governed by the 'discovery rule,' and does not begin to run until discovery of the fraud itself or of 'such facts as would have led to the knowledge thereof, if pursued with reasonable diligence.'" (citations omitted)); *Allsbrook v. Horry Cnty.*, C/A No. 2004-UP-285, 2004 WL 6308056, at *4 (S.C. Ct. App. Apr. 30, 2004) ("A cause of action for breach of fiduciary duty is governed by the discovery rule and must be brought within three years of the time the person knew or should have known by exercise of reasonable diligence that he had a cause of action." (citing S.C. Code Ann. §§ 15–3–530(5) & 15–3–535)); *see also Little v. Smith*, 943 S.W.2d 414, 420 (Tex. 1997) ("Generally, in a case of fraud the statute of limitations does not commence to run until the fraud is discovered or until it might have been discovered by the exercise of reasonable diligence.  Similarly, when there has been a breach of fiduciary duty, the statute of limitations does not begin to run until the claimant knew or should have known of facts that in the exercise of reasonable diligence would have led to the discovery of the wrongful act." (citations omitted)); *Gibson v. Ellis*, 58 S.W.3d 818, 823 (Tex. App. 2001) ("The discovery rule applies equally to breach of contract, negligence, and fraud claims." (citations omitted)).

face of the Complaint alone on a Rule 12(b)(6) Motion, the Court cannot determine these claims

against SGC are barred by the statute of limitations.  Therefore, SGC's Motion to Dismiss must

be denied on these grounds.

### C.  ASSIGNABILITY OF THE INVESTOR CLAIMS

Joining in the arguments asserted by the other Defendants, SGC asserts the Investor Claims

should be dismissed because the Trustee lacks standing to bring the Investor Claims.  SGC

contends the assignments from the investors to the Trustee are improper and unenforceable

because the claims are not assignable under South Carolina law.  In support of this argument, SGC

relies on the dissenting opinion in *In re Bogdan*, 414 F.3d 507 (4th Cir. 2005) and attempts to

distinguish *Bogdan* from the case at hand.  In *Bogdan*, the debtor was involved with others in a

real estate "flipping scheme" that defrauded numerous mortgage lenders.  Some of the lenders

injured by this scheme unconditionally assigned to the trustee all of their claims against the debtor

and his alleged coconspirators.  The trustee then filed an adversary proceeding as assignee of these

mortgage lenders and asserted various causes of action against the alleged coconspirators, which

were dismissed because the trustee lacked standing. *Id.* at 509-11.

The Fourth Circuit reversed the lower court's decision and concluded that the trustee had

standing because he was not making any claim on behalf of the creditors, but by taking

unconditional assignments from the creditors, was making his claim on behalf of the estate. *Id.* at

511.  The court reasoned that "[t]he mortgage lenders will recover, if at all, like any other creditor

of the estate, by sharing from the assets the trustee is able to collect on behalf of the estate." *Id.* at

512.  The Fourth Circuit also determined there was no potential for duplicative and inconsistent

litigation by the assignees because "[b]y giving the trustee unconditional assignments of their

potential claims, the mortgage lenders have relinquished all rights to seek recovery against Bogdan

20

and the alleged coconspirators." *Id.* The court also concluded that the Bankruptcy Code implicitly authorizes the type of suit brought by the trustee. *Id.* ("[T]he unconditional assignments acquired by Bogdan's trustee from the mortgage lenders after commencement of this bankruptcy case constitute 'property of the estate' that the trustee is authorized to 'collect and reduce to money' on behalf of the estate . . . Accordingly, the trustee has the requisite standing to sue Bogdan's alleged coconspirators 'to collect and reduce to money' the causes of action he acquired for the estate from the mortgage lenders after commencement of this bankruptcy case.").

The dissenting opinion acknowledged that the majority's decision "is predicated entirely on the assumed validity of the assignments, a proposition we accept in viewing the complaint in the light most favorable to the trustee . . ." However, it went on to state that "the assignments here are likely invalid under Maryland law, which precludes the assignment of claims if it contravenes public policy." *Id.* at 516 (citations omitted). The dissenter believed the assignment contravened Maryland's public policy because "the trustee for the estate of a tortfeasor is seeking to sue the debtor's joint tortfeasors. Put simply, one of several thieves, purportedly acting on behalf of his victims, is suing his fellow thieves." *Id.* at 517.

SGC has challenged the validity of the assignments under South Carolina law, which was not analyzed in *Bogdan*. Therefore, the Court must look further into this issue. The general rule followed in the Fourth Circuit is that "[f]ederal bankruptcy law looks to state law for definition of what interests are rights of the debtor or creditors of the debtor." *Steyr-Daimler-Puch of Am. Corp. v. Pappas*, 852 F.2d 132, 135 (4th Cir. 1988). State law limitations on the assignability of state law claims are not preempted by the Bankruptcy Code and remain effective as "limitations imposed upon the debtor by applicable nonbankruptcy law." *Integrated Solutions Inc. v. Serv.*

*Support Specialties, Inc.*, 124 F.3d 487, 493 (3d Cir. 1999) (citations omitted).[14]  "It is the

established law in South Carolina, and elsewhere as well, that a right of action is assignable if, and

only if, the same action would survive to the assignor's personal representative in the event of the

assignor's death." *Schneider v. Allstate Ins. Co.*, 487 F. Supp. 239, 241 (D.S.C. 1980) (citing

*Doremus v. Atlantic Coast R.R. Co.*, 242 S.C. 123, 130 S.E.2d 370 (1963)).  South Carolina law

provides:

> Causes of action for and in respect to any and all injuries and trespasses to and upon
> real estate and any and all injuries to the person or to personal property shall survive
> both to and against the personal or real representative, as the case may be, of a
> deceased person and the legal representative of an insolvent person or a defunct or
> insolvent corporation, any law or rule to the contrary notwithstanding.

S.C. Code Ann. § 15-5-90.  "The general survivability statute has a wide ambit that includes all

causes of action not covered by specific exceptions." *Ferguson v. Charleston Lincoln Mercury,*

*Inc.*, 349 S.C. 558, 563, 564 S.E.2d 94, 96-97 (2002).  Despite the clear language of the statute,

South Carolina courts have created certain exceptions to the survivability statute, including actions

for fraud and deceit. *Id.* (citing *Mattison v. Palmetto State Life Ins. Co.,* 197 S.C. 256, 15 S.E.2d

117 (1941) (a cause of action for fraud did not survive the death of a person who was allegedly

defrauded by an apparent cancellation of an insurance policy)).

The plaintiff in *Ferguson* brought an action under the South Carolina Regulation of

Manufacturers, Distributors, and Dealers Act, alleging the dealer included an improper fee in the

purchase price of the car and concealed that price through either fraudulent actions or negligent

---

[14] However, the Court looks to federal law for any limitations on the assignability of federal claims. *See Bluebird Partners, L.P. v. First Fid. Bank, N.A. New Jersey*, 85 F.3d 970, 973 (2d Cir. 1996) ("The federal courts have consistently determined that federal law governs the assignability of claims under the federal securities laws."); *see also In re Preston Trucking Co., Inc.*, 392 B.R. 623, 630 (D. Md. 2008) (reasoning that because the WARN Act is a federal statute, that the assignability of claims brought under it was governed by federal law).  The Investor Claims against SGC include a federal cause of action for violations of § 10 and Rule 10b-5 of the Securities and Exchange Act of 1934.  Although briefed by the Trustee, neither Defendants nor SGC raised any argument that this claim was not assignable under federal law; therefore, the Court will not address the validity of the assignment of this claim.

practices. *Id.* at 561-62.  The Dealers Act defined fraud broadly to include "a misrepresentation in any manner, whether intentionally false or due to gross negligence, of a material fact; a promise or representation not made honestly and in good faith; and an intentional failure to disclose a material fact." S.C. Code Ann. § 56–15–10(m).  The South Carolina Supreme Court found that even though the plaintiff's cause of action arose directly under the Dealers Act, because it was based upon a theory of fraud and deceit it did not survive the plaintiff's death.

In *Tilley v. Pacesetter Corp.*, 355 S.C. 361, 585 S.E.2d 292 (2003), the South Carolina Supreme Court did not expand its holding in *Ferguson* to actions brought under the Consumer Protection Code.  The court reasoned that, even though "[t]he Consumer Protection Code and the Dealers Act share a common purpose: protection of the consumer . . . the Dealers Act arguably expanded the definition of fraud to include actions that would not normally amount to fraud.  The Consumer Protection Code does not define fraud at all." *Id.* at 378.  Further, the plaintiff in *Ferguson* alleged the dealer committed an unfair act by failing to disclose a closing fee in the price of the car whereas in *Tilley*, the plaintiffs asserted the defendant violated statutory mandates of "S.C. Code Ann. § 37-10-102 in failing to notify them of their right to choose an attorney and insurance agent of their preference.  Neither § 37-10-102 nor the penalty section, § 37–10–105, refer to violation of the statutory preference requirements in terms of unfairness, fraud, or deceit." *Id.* at 378.

To the extent the Trustee's Investor Claims assert a common law fraud claim against SGC, such claim is not assignable under South Carolina law and must be dismissed. *See Mattison*, 197 S.C. 256, 15 S.E.2d 117.  However, the Court cannot conclude from the face of the Complaint that the remaining state law Investor Claims fall within the "fraud and deceit" exception to the survivability statute. *See, e.g., Designer Showrooms, Inc. v. Kelley*, 304 S.C. 478, 480-81, 405

S.E.2d 417, 419 (Ct. App. 1991) ("An intent to deceive is an essential element of 'actual fraud' but neither actual dishonesty of purpose nor intent to deceive is an essential element of 'constructive fraud,' and the presence or absence of such an intent distinguishes actual fraud from constructive fraud. ").  Therefore, to the extent the sixth cause of action in the Complaint asserts a claim for common law fraud against SGC on behalf of the investors, it must be dismissed. However, SGC has failed to show at this stage that relief should be granted pursuant to Rule 12(b)(6) regarding the remaining Investor Claims.

**CONCLUSION**

Based on the foregoing, **IT IS, THEREFORE, ORDERED THAT**:

(1) SGC's Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(3) is **denied**;

(2) SGC's Motion to Transfer Venue is **denied**;

(3) SGC's Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6) is **granted** to the extent the sixth cause of action in the Complaint asserts a claim for common law fraud against SGC on behalf of the investors;[15]

(4) all other remaining requested relief in SGC's Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6) is **denied**; and

(5) pursuant to Fed. R. Bankr. P. 7012(a), SGC shall file a responsive pleading within **fourteen (14) days** from entry of this Order.

**AND IT IS SO ORDERED.**
**FILED BY THE COURT**
**05/24/2018**



_US Bankruptcy Judge_
_District of South Carolina_

Entered: 05/24/2018

---

[15] However, to the extent the sixth cause of action asserts a claim for common law fraud against SGC on behalf of the estate, that claim remains.